## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**OTTAWA BANCSHARES, INC.,**

      **Plaintiff,**

      **v.**                                  **Case No. 23-2444-JAR**

**GREAT AMERICAN SECURITY**
**INSURANCE COMPANY,**

      **Defendant.**

## MEMORANDUM AND ORDER

Plaintiff Ottawa Bancshares, Inc. ("Ottawa") brings this action challenging Defendant Great American Security Insurance Company ("Great American")'s denial of coverage for untimely notice under a claims-made Directors and Officers ("D & O") policy.  Plaintiff brings four claims: a declaratory-judgment claim seeking a declaration of coverage for defense costs and indemnity; a breach-of-contract claim for Defendant's denial of coverage; a breach-of-contract claim for denial of pre-tender defense costs; and a claim for attorney's fees under K.S.A. § 40-256, which entitles an insured to attorney's fees for bad-faith denial of coverage.  Before the Court is Defendant's Motion for Summary Judgment (Doc. 48).  The motion is fully briefed, and the Court is prepared to rule.  For the reasons explained below, the Court grants in part and denies in part Defendant's motion.[1]

---

[1] The Court denies Defendant's request for oral argument because the briefs are adequate to decide the motion.

## I.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[2]  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[3]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[4]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[5]  An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[6]

When the nonmoving party will bear the burden of persuasion at trial, the moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[7]  Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[8]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[9]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event

---

[2] Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[3] *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[4] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[5] *Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[6] *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[7] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

[8] *Anderson*, 477 U.S. at 256.

[9] *Id.*; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

of trial from which a rational trier of fact could find for the nonmovant."[10]  To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript[,] or a specific exhibit incorporated therein."[11]  The nonmoving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[12]

Where, on the other hand, the movant seeks summary judgment on its own affirmative defense—on which it will bear the burden of persuasion at trial—the defendant must "demonstrate that no disputed material fact exists regarding the affirmative defense asserted."[13] And that showing must be sufficient to "entitle [the movant] to a directed verdict if not controverted" at trial.[14]  Once the defendant makes this initial showing, "the plaintiff must then demonstrate with specificity the existence of a disputed material fact."[15]  If the plaintiff cannot meet this burden, "the affirmative defense bars [her] claim, and the defendant is then entitled to summary judgment as a matter of law."[16]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of

---

[10] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)).

[11] *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

[12] *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006).

[13] *Estrada v. Smart*, 107 F.4th 1254, 1261 (10th Cir. 2024) (quoting *Hutchinson v. Pfeil*, 105 F.3d 562, 564 (10th Cir. 1997)).

[14] *Brown v. Perez*, 835 F.3d 1223, 1231 (10th Cir. 2016); *see also* 11 Jeffrey W. Stempel and Steven S. Gensler, *Moore's Federal Practice* § 56.40 (3d ed. 2018) ("When the movant bears the burden of persuasion at trial, the movant must produce evidence that would conclusively support its right to a judgment after trial *should the nonmovant fail to rebut the evidence*." (emphasis added)); *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (noting that party's showing "must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party").

[15] *Hutchinson*, 105 F.3d at 564.

[16] *Id.*

3

every action.'"[17]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[18]

## II.    Uncontroverted Facts

The following facts are uncontroverted or viewed in the light most favorable to Plaintiff as the nonmoving party.  And those facts tell a familiar story: an insured has a commercial liability policy; a third party makes a claim against the insured; the insurer denies coverage for that claim; and the insured sues for coverage.

*The Policy*.  Plaintiff is a bank holding company with four affiliated banks, which are collectively insured by Defendant.  Plaintiff has a D&O liability policy with Defendant.  The Policy Period spans three Policy Years—September 26, 2021, to September 26, 2024.  The Policy is a claims-made policy,[19] and it features a $75,000 retention.[20]

The Policy includes a handful of insuring agreements, but the one at issue here is the "Broad-Form Company Liability Insuring Agreement," which provides coverage for claims made against Plaintiff itself (rather than its directors and officers).  Under that insuring agreement,

> The **Insurer** will pay on behalf of the **Company**, **Loss** resulting from **Claims** first made during the **Policy Period** or Extended Reporting Period against the **Company** for allegations involving or relating to:

---

[17] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[18] *Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

[19] Claims-made policies differ from occurrence policies, which cover claims that occur during the relevant period, regardless of whether the claim is reported during that period.  7 Jordan R. Plitt et al., Couch on Insurance § 102:22 (3d ed., Nov. 2024 update).

[20] A retention is similar to a deductible, but it is subtracted from the total loss, rather than the liability limit, as a deductible is.  Gary Lockwood, Law of Corporate Officers and Directors: Indemnification and Insurance § 4:6 (2d ed., 2024–2025 update).

. . . .

(4) other causes of action

for which the **Company** is legally obligated to pay for **Wrongful Acts**.[21]

The Policy then defines "**Loss**" as including "**Defense Costs**,"[22] which in turn is defined:

> **Defense Costs** means reasonable and necessary fees, costs, charges, expenses, including attorneys' fees . . . [and] mediators' fees . . . incurred by on behalf of an **Insured** with the **Insurer's** prior written consent in investigating or defending any covered **Claim**.[23]

The Policy also imposes on the insured an obligation to provide notice of a claim made against it. The operative provision provides:

> The **Insured**, as a condition precedent to any rights under this **Policy**, shall give the **Insurer** written notice, as soon as practicable, of any **Claim** first made and brought to the attention of an **Executive Officer** during the **Policy Period** or the Extended Reporting Period, but in no event later than ninety (90) days after the **Claim** is made.[24]

The Vista Endorsement modified that provision by replacing "ninety (90) days after the **Claim** is made" with "ninety" or "one hundred and eighty" days after the end of the policy period depending on the circumstances.[25] The Policy includes these relevant definitions:

> **Claim** . . . means any of the following instituted against . . . the **Company**:
>
> . . . .

---

[21] Doc. 49-1 at 27. Plaintiff "disputes" this provision by asserting that it is not the "only 'relevant part' of that insuring agreement." Doc. 50 at 1. Plaintiff appears to try to raise a genuine dispute of material by "showing that the materials cited do not establish the absence . . . of a genuine dispute," Fed. R. Civ. P. 56(c)(1)(B), but because Plaintiff does not challenge the provision's existence, the provision remains uncontroverted.

[22] Plaintiff again tries to controvert this fact by arguing that the provision does not include all relevant language. For the same reason noted above, *supra* note 21, the provision remains uncontroverted.

[23] Doc. 49-1 at 9.

[24] *Id.* at 21.

[25] *Id.* at 74.

> (1) a written demand . . . for monetary damages . . . .[26]
>
> **Executive Officer** means the . . . Chief Operating Officer
> . . . of the **Company.**[27]

Because the Policy Period extended to three years, the Policy also included a Multiple
Year Policy Endorsement, which imposed an additional notice requirement on Plaintiff:

> The **Company** must give the **Insurer** written notice, as soon as
> practicable, if any of the following occur during the **Policy Period**:
>
> . . . .
>
> e) the **Insurer** has paid a loss, claim or damage payment in excess
> of $25,000.[28]

Along with that additional notice provision, the Endorsement gave Defendant the following right
to alter the Policy's terms:

> If during any **Policy Year** [the event described in provision e)]
> ha[s] occurred, then effective as of the end of the **Policy Year** in
> which such transaction or event occurs, the **Insurer** will be entitled
> to impose additional terms, conditions and limitations of coverage
> and to charge additional premium as the **Insurer**, in its sole
> discretion, may require.[29]

Finally, the Policy includes the following no-action clause:

> No action shall be taken against the **Insurer** unless, as a condition
> precedent thereto, there shall have been full compliance with all of
> the terms of this **Policy**, and until the **Insured's** obligation to pay
> is finally determined, either by adjudication or by written
> agreement of the **Insured(s)**, the claimant, and the **Insurer**.[30]

*The Claim.* Plaintiff and a third party—Methods Research, Inc. ("MRI")—had a contract
under which MRI agreed to provide Plaintiff consulting services in exchange for a fee. After

---

[26] *Id.* at 70.

[27] *Id.* at 10.

[28] *Id.* at 76.

[29] *Id.* at 77.

[30] *Id.* at 26.

entering the contract, Plaintiff and MRI could not agree on the amount of the fee, and they corresponded for several years regarding the proper amount that Plaintiff owed for MRI's services. Hoping to end the back and forth, Plaintiff sent MRI an "ending note" that served as the final correspondence on the matter. That letter was sent in March 2021. MRI said it would respond, but it did not do so immediately. Instead, it responded nearly one year later by sending Plaintiff a demand letter.[31] The letter demanded $4.1 million as compensation for fees ostensibly owed to MRI under the contract. MRI sent the letter in February 2022, which fell within the first Policy Year.

Angie Eilrich, Executive Vice President and Chief Operations Officer of one of Plaintiff's affiliated banks, received the demand letter. Eilrich handled for Plaintiff potential claims against it. Plaintiff has no policies or procedures (formal or informal) for handling claims. Though without a college degree, Eilrich has worked for Plaintiff since 1981, and over those many years, she has gained extensive work experience. She handled claims for Plaintiff for twelve years, and she remembers no claim against Plaintiff during that time. In fact, despite receiving the demand letter, Eilrich did not bring the demand letter to the board's attention because, she explained, "this was, in our opinion, just more of the same of what we had dealt with . . . . [A]t this time we just still saw it as a business matter."[32] Nor did Eilrich (or anyone else) notify Defendant about the demand letter. But Plaintiff did choose to retain counsel in response to the demand and began pre-litigation mediation, which Eilrich assumed to be a "normal step in something like this when you have a business dispute."[33] The mediation was unsuccessful. MRI then filed a lawsuit on March 24, 2023, and Plaintiff notified Defendant of

---

[31] Both sides characterize this correspondence as a demand letter. *See* Doc. 49 ¶ 12; Doc. 50 ¶ 31.

[32] Eilrich Dep., Doc. 50-13 at 82:11–18.

[33] *Id.* at 93:16–17.

the lawsuit on April 3, 2023.  The suit was filed during the second Policy Year.  And, as required under the D&O policy, Plaintiff sought Defendant's written consent for defense costs, which Defendant provided on April 20, 2023.  All told, thirteen months elapsed between Plaintiff's receipt of the demand letter and its notice to Defendant.[34]

*The Denial*.  After receiving notice of the claim, Laura Nigro, one of Defendant's claims handlers, reviewed the claim.  She initially characterized the claim as likely a denial under the D&O policy's Contract Exclusion.  But later—after speaking with Eilrich and learning of the February 2022 demand letter—Nigro determined that coverage was unavailable because Plaintiff did not provide timely notice of the claim.  Nigro determined that notice was untimely based on the policy year in which the claim was made and the time that the claim arose.  From the time of the demand letter on February 18, 2022, to April 3, 2023, Plaintiff incurred approximately $153,107.47 in legal expenses.  More than $100,000 of that was incurred during the first Policy Year and would have qualified as defense costs.  If Defendant had made payments connected to a claim over $25,000, it would  have flagged the multi-year criteria in the Multiple Year Policy Endorsement.  On July 17, 2024, Defendant sent Plaintiff a letter denying coverage.  To challenge that coverage denial, Plaintiff filed this suit against Defendant.

## III.    Discussion

Plaintiff alleges the following claims: declaratory judgment (Count I), breach of contract for "Denial of Coverage Obligations" (Count II) and "Pre-Tender Defense Costs" (Count III), and "Bad Faith" (Count IV).  Defendant argues that it is entitled to summary judgment on all claims because (1) the Policy's no-action clause bars Plaintiff's claims to the extent they seek

---

[34] The parties do not dispute that under the Policy's terms, multiple claims arising from the same wrongful act—like the demand letter and lawsuit here—are treated as a single claim and dated to the earliest of the claims.  So for the purposes of timely notice, the demand letter is the relevant claim.

relief other than defense costs; (2) it owed Plaintiff no coverage because Plaintiff did not provide

timely notice as required under the Policy; (3) it owes Plaintiff no pre-tender defense costs

because Plaintiff did not obtain consent as required under the policy; and (4) its denial of

coverage was based on a good-faith legal dispute and, thus, not in bad faith.  After laying out

basic contract-interpretation principles, the Court addresses each of these responses in turn.

###    A.      Kansas Rules of Insurance Contract Interpretation

The parties do not dispute that Kansas law applies to this action.  Under Kansas law, the

interpretation of an insurance policy is, like any other contract, a "matter of law to be determined

by the court."[35]  "In construing an insurance policy, a court should consider the instrument as a

whole and endeavor to ascertain the intention of the parties from the language used, taking into

account the situation of the parties, the nature of the subject matter, and the purpose to be

accomplished."[36]  And it is well established that "judicial interpretation should not render any

[contract] term meaningless."[37]  Regarding endorsements to an insurance policy, "the

endorsement and the policy must be read together.  The policy remains in full force and effect

except as altered by the words of the endorsement.  Conversely, the endorsement modifies, to the

extent of the endorsement, the terms and conditions of the original insurance contract."[38]

If an insurance policy's language is clear and unambiguous, the court must apply it in "its

plain, ordinary, and popular sense."[39]  "An insurance policy is ambiguous when it contains

---

[35] *Am. Media, Inc. v. Home Indem. Co.*, 658 P.2d 1015, 1018 (Kan. 1983) (quoting *Mah v. U.S. Fire Ins. Co.*, 545 P.2d 366 (Kan. 1976)).

[36] *Iron Horse Auto, Inc. v. Lititz Mut. Ins. Co.*, 156 P.3d 1221, 1225−26 (Kan. 2007) (citing *O'Bryan v. Columbia Ins. Grp.*, 56 P.3d 789, 792 (Kan. 2002)).

[37] *LDF Food Grp., Inc. v. Liberty Mut. Fire Ins. Co.*, 146 P.3d 1088, 1095 (Kan. Ct. App. 2006) (first citing *Marshall v. Kan. Med. Mut. Ins. Co.*, 73 P.3d 120, 130 (Kan. 2003); and then citing *Farm Bureau Mut. Ins. Co. v. Horinek*, 660 P.2d 1374, 1378 (Kan. 1983)).

[38] *Thornburg v. Schweitzer*, 240 P.3d 969, 976 (Kan. Ct. App. 2010).

[39] *First Fin. Ins. Co. v. Bugg*, 962 P.2d 515, 519 (Kan. 1998).

language of doubtful or conflicting meaning based on a reasonable construction of the policy's language."[40]  Put differently, ambiguity arises when "application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning."[41]  An insurance policy is not ambiguous "merely because the parties disagree on the interpretation of the language."[42]  And "[c]ourts should not strain to find an ambiguity where common sense shows there is none."[43]

### B.    No-Action Clause

Defendant seeks summary judgment on all claims to the extent that they seek relief other than defense costs because such recovery is barred by the Policy's no-action clause.[44]  Recall that the Policy's no-action clause provides that "no action shall be taken against the **Insurer** . . . until the **Insured's** obligation to pay is finally determined" either by a court's judgment or the parties' agreement.[45]  The parties do not dispute that this provision is unambiguous.  The two determinative phrases here are "no action shall be taken against the Insurer" and "until the Insured's obligation to pay is finally determined."  The Policy's clear language applies to Plaintiff's claims because they are claims brought against the insurer.  Although a no-action clause may usually serve as a way to limit direct actions by a third party against the insurer,[46] the Court cannot disregard the Policy's clear language, which makes no distinction between actions

---

[40] *Marshall*, 73 P.3d at 130.

[41] *Gerdes v. Am. Fam. Mut. Ins. Co.*, 713 F. Supp. 2d 1290, 1296 (D. Kan. 2010) (quoting *Cath. Diocese of Dodge City v. Raymer*, 840 P.2d 756, 459 (Kan. 1992)).

[42] *Marshall*, 73 P.3d at 130 (citing *Jones v. Reliable Sec. Inc.*, 28 P.3d 1051, 1059 (2001)).

[43] *Id.* (citing *Bugg*, 962 P.2d at 519).

[44] No-action clauses are valid under Kansas law.  *See Bayless v. Bayless* 392 P.2d 132 (Kan. 1964) (enforcing no-action clause).

[45] Doc. 49-1 at 26.

[46] *See* 7A Plitt et al., *supra* note 19, § 105:7.

brought by the insured and those brought by third parties who may bring a direct action against the insurer.

Thus, because Plaintiff's action is one against the insurer, whether the clause bars the Plaintiff's claims rests on whether Plaintiff's obligation to pay has been finally determined. And neither of the provision's two methods for final determination has occurred: there has been no agreement between the parties determining Plaintiff's obligation to pay, and there has been no adjudication of that issue either because the underlying case—*Methods Research Inc. v. Ottawa Bancshares, Inc.*—remains pending.[47] So because Plaintiff's obligation to pay has not been finally determined by either of the two methods prescribed in the no-action clause, the plain and unambiguous language of the clause bars Plaintiff's claims here.

Nevertheless, Defendant concedes—primarily based on a Tenth Circuit case, *Paul Holt Drilling, Inc. v. Liberty Mutual Insurance*[48]—that the no-action clause does not bar Plaintiff's claims for defense costs. In *Paul Holt*, a third party sued Paul Holt Drilling, Inc., and its insurer denied both coverage for the suit and its duty to defend the suit.[49] In response, Paul Holt sued the insurer for breach of contract.[50] Considering only whether the no-action clause barred suit for breach of the insurer's duty to defend, the Tenth Circuit concluded that it did not.[51] Because the parties do not dispute that the no-action clause does not bar Plaintiff's claims for defense costs, the Court need not address whether the no-action clause in fact bars them.

---

[47] The Court takes judicial notice of its own docket to conclude that the case, No. 23-2136, is still pending. *See Valley View Angus Ranch, Inc. v. Duke Energy Field Servs., Inc.*, 497 F.3d 1096, 1107 n.18 (10th Cir. 2007) (first citing Fed. R. Evid. 201; and then citing *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1172 (10th Cir. 1979)) (taking judicial notice of pleadings in another case on court's docket).

[48] 664 F.2d 252 (10th Cir. 1981) (finding that no-action clause did not bar insured's defense-costs claim against insurer).

[49] *Id.* at 253.

[50] *Id.*

[51] *Id.* at 254–55.

Plaintiff, however, goes a step further: it argues that the no-action clause does not bar any of its claims against Defendant.  Plaintiff also relies on *Paul Holt* but reads it more expansively than is warranted.  Picking up on this line from *Paul Holt*—"[w]e think the Oklahoma court would hold the no action clause is intended to apply only to claims made by third parties"[52]—Plaintiff argues that because its claims against Defendant are not brought by a third party, the claims fall under *Holt*'s exception for no-action clauses.

Plaintiff's reliance on that line from *Paul Holt* is misplaced.  First, the circuit addressed Oklahoma law, not Kansas law, so the case's application to this dispute is far from clear.[53] Second, the circuit later clarified (albeit in an unpublished opinion) the scope of *Paul Holt*'s holding: *Paul Holt*'s reasoning does not apply to claims that "involve[] the duty to indemnify and not the duty to defend."[54]  Given that clarification, Plaintiff's claims, to the extent that they seek indemnification, remain barred, even in light of *Paul Holt*.  The District of Colorado case that Plaintiff cites adds nothing to the analysis.[55]  In that case, the court agreed that a no-action clause did not bar a suit by the insured against the insurer to recover defense costs for an ongoing dispute.[56]  But the court permitted the suit to proceed only as to the claims for the defense costs;

---

[52] *Id.* at 254.  As the quotation suggests, *Paul Holt* made an *Erie* guess on how Oklahoma law would handle the no-action clause.  Whether Kansas law would find that the no action clause bars a claim challenging the duty to defend is apparently an open question: the parties cite no Kansas law, and the Court finds none addressing the issue.  But because the parties do not contest that the no-action clause does not bar Plaintiff's claims for defense costs, the Court need not—and so does not—make an *Erie* guess on this issue.

[53] *See Wyo. ex rel. Dept. of Env't Quality v. Federated Serv. Ins. Co.*, 211 F.3d 1279 (10th Cir. 2000), 2000 WL 525971, at *3 (unpublished table decision) ("*Paul Holt Drilling* interpretated Oklahoma law, and therefore does not control when, as here, we are required to apply Wyoming law.").

[54] *Id.* at *4.

[55] *Fight Against Coercive Tactics Network, Inc. v. Coregis Ins. Co.*, 926 F. Supp. 1426 (D. Colo. 1996).

[56] *Id.* at 1435.

it was silent on whether the no-action clause barred a suit challenging the insurer's duty to indemnify for the underlying suit.[57]

Because the no-action clause bars Plaintiff's claims for recovery other than defense costs, the Court grants summary judgment for Defendant on all claims to the extent that they seek recovery other than defense costs.

### C.    Pre-Tender Defense Costs

Defendant moves for summary judgment on Plaintiff's claim for pre-tender defense costs because Plaintiff incurred those costs prior to obtaining Defendant's consent, as required by the Policy.

The Policy obligates Defendant to pay for "loss resulting from claims," and under the Policy, a loss includes defense costs. Defense costs are defined as costs "incurred by or on behalf of the **Insured** *with the **Insurer's** prior written consent* in investigating or defending any covered **Claim**."[58] This provision is clear and unambiguous. Costs incurred by the insured are not covered as defense costs unless the insured obtained the insurer's consent to incur them. It is undisputed that Plaintiff did not receive Defendant's written consent for the defense costs until April 20, 2023. Under the plain terms of the Policy, Plaintiff therefore is not owed for any defense costs that arose prior to April 20, 2023, when Plaintiff obtained Defendant's consent to the costs.

Plaintiff does not dispute the basic point that defense costs are not covered unless the insured obtains prior consent. Instead, Plaintiff argues that Defendant must show it was prejudiced by Plaintiff's incurring defense costs without obtaining Defendant's consent. The

---

[57] *Id.* at 1437.

[58] Doc. 49-1 at 9 (emphasis added).

parties point to no Kansas Supreme Court case addressing this issue, so the Court is placed in the position of ascertaining what the Kansas Supreme Court would do if presented with the issue.[59] Plaintiff asserts that "Kansas law requires an insurance company to demonstrate it was prejudiced by the failure to receive consent before such costs are denied."[60]  It then cites three cases where that specific issue never arose[61] and does nothing to develop the analogy between those cited cases and this case.  And in any event, those marginally relevant citations do not persuade the Court that the Kansas Supreme Court, if presented with the issue, would disavow the general weight of authority presented by Defendant, which holds that a showing of prejudice is not required.[62]  The Court predicts that the Kansas Supreme Court would agree with numerous courts and a leading insurance-law treatise that "an insurer is not liable for the pretender costs of defense incurred by the insured irrespective of the existence of prejudice."[63]

### C.    Notice

Finally, Defendant moves for summary judgment on its late-notice defense, which requires the Court to resolve three issues: (1) whether Plaintiff failed to give timely notice; (2) if

---

[59] *Oliveros v. Mitchell*, 449 F.3d 1091, 1093 (10th Cir. 2006).

[60] Doc. 50 at 35.

[61] *Fid. & Deposit Co. v. Hartford Cas. Ins. Co.*, 215 F. Supp. 2d 1171, 1187 n.9 (D. Kan. 2002) (requiring prejudice from insured's failure to give notice, not its failure to obtain insurer's consent); *Dillon Cos. v. Royal Indem. Co.*, 369 F. Supp. 2d 1277, 1290 (D. Kan. 2005) (requiring prejudice from insured's decision to settle without notice to insurer); *Cessna Aircraft Co. v. Hartford Accident & Indem. Co.*, 900 F. Supp. 1489, 1517 (D. Kan. 1995) (same).

[62] *Am. Mut. Liab. Ins. Co. v. Beatrice Cos.*, 924 F. Supp. 861, 874 (N.D. Ill. 1996) ("[T]he 'no pre-tender defense costs' rule remains viable even in jurisdictions that have adopted the 'notice-prejudice' rule.") (collecting cases); *see, e.g.*, *Abrams v. RSUI Indem. Co.*, 272 F. Supp. 3d 636, 643 (S.D.N.Y. 2017) ("[P]laintiffs have failed to establish that Delaware . . . would stray from the well-established principle that pre-notice defense expenses are generally not covered, irrespective of prejudice."); *Dreaded, Inc. v. St. Paul Guardian Ins. Co.*, 904 N.E.2d 1267, 1273 (Ind. 2009) ("St[.] Paul did not need to present any separate proof of prejudice to justify its failure to defend during the pre-notice period.").

[63] *See* 14 Plitt et al., *supra* note 19, § 200:35.

so, whether the notice-prejudice rule applies; and (3) if so, whether Defendant in fact was prejudiced from the late notice.

### 1. Untimely Notice

Under Kansas law, Defendant bears the burden to show that Plaintiff's notice was untimely.[64]  So it must come forward with evidence that, if uncontroverted at trial, would entitle it to judgment as a matter of law.[65]

The Court finds that Defendant has made that initial showing.  The Policy requires Plaintiff to give notice "as soon as practicable" of any "**Claim** first made and brought to the attention of an **Executive Officer** during the **Policy Period** or Extended Reporting Period, but in no event later than" 90 days after the Policy Period (or 180 days in some circumstances).[66]

Because the Policy is a claims-made policy, this notice provision plays a special role in defining the scope of coverage.  As is typical for claims-made policies, the notice provision includes two separate components: a prompt-notice provision and a policy-period provision.  A prompt-notice provision often requires that the insured notify the insurer of a claim "as soon as practicable" (or with some other degree of promptness), which allows the insurer to "maximiz[e] [its] opportunity to investigate, set reserves, and control or participate in negotiations with the third party asserting the claim against the insured."[67]  Prompt-notice provisions like this are features of both occurrence-based and claims-made policies.[68]  A policy-period provision, on the

---

[64] *Geer v. Eby*, 432 P.3d 1001, 1014 (Kan. 2019) (finding that insurer "carried its burden to show the breach and prejudice necessary" for its late-notice defense); *Hanlon Chem. Co. v. United Fire & Cas. Co.*, No. CIV. A. 02-2416, 2003 WL 22466190, at *3 (D. Kan. Aug. 20, 2003) (citing *Creek v. Harder Constr., Inc.*, 961 P.2d 1240, 1244 (Kan. Ct. App. 1998)) (noting that insurer "must show . . . that it did not receive timely notice").

[65] *See Brown v. Perez*, 835 F.3d 1223, 1231 (10th Cir. 2016).

[66] Doc. 49-1 at 9.

[67] 13 Plitt et al., *supra* note 19, § 186:13.

[68] *Craft v. Phila. Indem. Ins. Co.*, 560 F. App'x 710, 714 (10th Cir. 2014).

other hand, plays a different role in the policy: it limits coverage under the policy only to claims made during the policy period.[69]  Such provisions are characteristic of claims-made policies and are distinct from prompt-notice provisions.  Indeed, they serve a different purpose: they set the "temporal boundaries of the policy's basic coverage terms."[70]  The essential difference, then, is that the prompt-notice requirement "looks to the length of time between the point when the insured knew or should have known of the likelihood of a claim and the point at which the insured notified the insurer of those facts," and the policy-period requirement "compares only the point at which the claim is made and the point at which the policy period ends."[71]

Here, the Policy's requirement that Plaintiff "shall . . . give **Insurer** written notice, as soon as practicable" is the prompt-notice provision; the Policy's requirement that notice be given "no later than" 90 days after the Policy expires or, if renewed, 180 days after the Policy Period ends is the policy-period provision.  Both parties agree that Plaintiff provided notice within the Policy Period and thus, complied with the policy-period requirement.[72]  Instead, the parties dispute whether Plaintiff complied with the prompt-notice requirement; that is, whether Plaintiff provided notice of MRI's claim against it "as soon as practicable."

Kansas law defines "as soon as practicable" as "within a reasonable period of time in view of all the relevant facts and circumstances of a particular case."[73]  This is an objective

---

[69] 13 Plitt et al., *supra* note 19, § 186:13.

[70] *Id.*

[71] *Id.*

[72] In its reply brief, Defendant concedes that Plaintiff gave notice "within the three-year policy period." Doc. 53 at 7.

[73] *Cessna Aircraft Co. v. Hartford Accident & Indem. Co.*, 900 F. Supp. 1489, 1515 (1995) (citing *Travelers Ins. Co. v. Feld Car & Truck Leasing Corp.*, 517 F. Supp. 1132, 1134 (D. Kan. 1981)); *Evergreen Recycle, LLC v. Ind. Lumbermens Mut. Ins. Co.*, 350 P.3d 1091, 1123 (Kan. Ct. App. 2015).

standard, so an insured's subjective belief about the reasonableness of notice is irrelevant.[74]  And although reasonableness of notice is often a fact question, where "the circumstances explaining the delay are undisputed and reasonable persons still could not help but conclude that notice was untimely," notice is untimely as a matter of law.[75]  Finally, an insured is "presumed to know" the contents of a policy and, thus, what events trigger the Policy's notice requirement.[76]

Here, the Court finds that Defendant has carried its burden to show facts that, if uncontroverted at trial, establish that Plaintiff's 13-month delay was unreasonable as a matter of law.  In reaching that conclusion, the Court relies on numerous undisputed facts.  The Policy requires that once one of Plaintiff's Executive Officers is apprised of a claim made against Plaintiff, the claim must be reported to the Insurer.  The Policy defines a claim as, among other things, "a written demand . . . for monetary damages."[77]  Putting those provisions together, once a monetary demand for damages was made to an executive officer of Plaintiff, it was required to give Defendant notice of that demand as soon as practicable.  In February 2022, MRI sent Plaintiff a pre-suit demand letter detailing certain claims against it, and in that letter, Plaintiff demanded $4.1 million from Plaintiff as compensation for fees ostensibly owed to MRI under a services contract between Plaintiff and MRI.  The parties do not dispute that Angie Eilrich—the Vice President and Chief Operations Officer at a member bank—qualifies as an "Executive Officer" under the Policy's prompt-notice provision.  She received the letter in February 2022.

---

[74] *Home Life Ins. Co. v. Clay*, 719 P.2d 756, 760 (Kan. Ct. App. 1986) (citing *Travelers Ins.*, 517 F. Supp. at 1134); *see also* 13 Plitt et al., *supra* note 19, § 190:40 (describing reasonableness as determined by "objective standard . . . not the insured's personal, subjective beliefs").

[75] *Home Life*, 719 P.2d at 760 (citing *Travelers Ins.*, 517 F. Supp. at 1134).

[76] *Felling v. Hobby Lobby*, No. Civ. A. 04-2374-GTV, 2005 WL 92 8641, at *4 (D. Kan. Apr. 19, 2005); *Lallak v. Farmers' Mut. Ins. Co. of Marysville*, 257 P.2d 933, 936 (Kan. 1953) ("[The insured] was bound to know the provisions thereof.").

[77] Doc. 49-1 at 70.

17

But she did not report that written demand for monetary damages to Defendant. Instead, Plaintiff retained counsel, which resulted in a pre-litigation mediation. No reasonable person could conclude based on the foregoing undisputed facts that Plaintiff—after receiving a demand letter for damages arising from claims against it—gave notice as soon as practicable when it gave notice 13-months after receiving the demand letter. The Court finds that through those undisputed facts, Defendant has carried its initial burden to "demonstrate that no disputed material fact exists regarding"[78] the untimeliness of notice.

Plaintiff's response is that its 13-month delay was reasonable because it did not know the demand letter qualified as a claim that triggered the prompt-notice requirement. But Kansas law presumes the insured knows the contents of its policy, and the Policy was unequivocal: a written demand for monetary damages is a claim that triggers the notice requirement. Contrast that clarity with the ambiguous provision in *Home Life Insurance Co. v. Clay*,[79] which Plaintiff relies on to support its position that a 13-month delay is not unreasonable as a matter of law. In that case, the Kansas Court of Appeals found that an 18-month delay did not establish untimely notice as a matter of law.[80] But the notice-triggering event was nebulous: the insured had to give notice of a "loss."[81] And the insured argued that a meeting where an opposing party raised the possibility of liability did not qualify as a "loss." In reaching its conclusion that notice was not untimely as a matter of law, the court noted that the insured had been "assured that [it] would not be sued" and that it would be difficult for the insured to predict a "loss" under the policy—which would trigger the notice requirement—because no loss would occur unless a third-party claim

---

[78] *Estrada v. Smart*, 107 F.4th 1254, 1261 (10th Cir. 2024).

[79] 719 P.2d 756 (Kan. Ct. App. 1986).

[80] *Id.* at 760.

[81] *Id.*

was "successfully establish[ed]" against the insured, which was speculative.[82]  Those facts

supported the possibility of a reasonable delay because the insured reasonably believed that a

meeting did not qualify as a loss triggering the notice requirement.  The *Home Life* case, then, is

one of those cases where the timeliness of notice "rest[s] on a proper determination of when the

event triggering the obligation to give notice occurred."[83]  But this is not that case.  Far from

being assured that it would not be sued, Plaintiff here received a written demand for $4.1 million

for ostensible claims against it, and the Policy is clear and unambiguous that the notice

requirement is triggered by "a written demand . . . for monetary damages."[84]  *Home Life* does not

alter the Court's conclusion that Defendant has established untimely notice as a matter of law.

Plaintiff also argues that even if Defendant had made its showing, a genuine dispute of

material fact exists because there are facts from which a reasonable fact finder could find notice

timely; specifically, that a reasonable person would not have viewed the demand letter as a

written demand for monetary damages.  First, Plaintiff points out that the written demand letter

was sent to Plaintiff nearly one year after a "continuous dialogue" over "the interpretation and

application" of the parties' services agreement.[85]  In particular, MRI would send Plaintiff

consistent requests for documentation, data, and explanations of the methodology supporting

Plaintiff's payment determinations.  And so from Plaintiff's perspective, it was a continuation of

the same ongoing business dispute, not an escalation into a claim.  Regardless of what Plaintiff's

own subjective belief was (which is not relevant for this objective standard), the fact of the

---

[82] Plaintiff tries to garner support for its "unsophisticated insured" argument from this line in the case: an 18-month delay could be reasonable where insured was "a small town bank with less experience."  *Id.*  But that line comes from the party's argument, not the court's holding, and in the court's explanation of why it agrees with the insured, it does not rely on the insured's experience.  *Id.*

[83] *See* 13 Plitt et al., *supra* note 19, § 190:3.

[84] Doc. 49-1 at 70.

[85] Doc. 50 at 19.

ongoing discussion does not create a genuine dispute of material fact here. It is undisputed that Plaintiff and MRI's dialogue was protracted. But it is also undisputed that the correspondence ceased shortly after March 2021—a year before MRI sent the demand letter. And it is also undisputed that the demand letter, asking for $4.1 million for claims arising from the services contract, was different in kind from a "disagreement over the interpretation and application" of the contracts.[86] Plaintiff itself says that "because the demand letter came from lawyers, [Plaintiff] hired lawyers to assist in that process."[87] In short, Plaintiff's continuous dialogue with MRI about the interpretation and application of their agreement, which ended almost a year before MRI sent the demand letter, does not create a material dispute about whether a reasonable person would view the demand letter as a written demand for monetary damages triggering the Policy's notice requirement. Second, Plaintiff appears to argue that it was an unsophisticated party unfamiliar with contracts and insurance policies, so that it would not understand that MRI's demand letter rose to the level of a claim under the Policy. But Plaintiff is not an unsophisticated party; it is a bank holding company.[88]

Defendant has shown as a matter of law that Plaintiff did not provide notice as soon as practicable of MRI's claim against it. Defendant has therefore carried its burden to "demonstrate

---

[86] *Id.* at 20.

[87] *Id.*

[88] *Nat'l Bank of Andover v. Kan. Bankers Sur. Co.*, 225 P.3d 707, 718 (Kan. 2010) (characterizing community bank as a sophisticated party); *First Nat. Bank & Tr. v. Miami Cnty. Co-op Ass'n*, 897 P.2d 144, 145 (Kan. 1995) (same). To the extent that Plaintiff suggests that it would "not expect a breach of contract lawsuit, much less [a] demand letter arising from a contract, to be covered," that argument fails as a matter of law because a party is presumed to know the contents of its policy, and Plaintiff concedes that "it is clear upon reading the Policy that it covers defense costs for breach of contract." *See Felling v. Hobby Lobby*, No. Civ. A. 04-2374-GTV, 2005 WL 92 8641, at *4 (D. Kan. Apr. 19, 2005); *Lallak v. Farmers' Mut. Ins. Co.*, 257 P.2d 933, 936 (Kan. 1953) ("[The insured] was bound to know the provisions thereof."). For similar reasons, Plaintiff's arguments that Eilrich did not personally know that the demand letter would qualify as a claim fail. Even if she did not personally know, Plaintiff, as the insured, was "under the duty to learn the contents" of its policy. *Felling*, 2005 WL 928641, at *4 (quoting *Rosenbaum v. Tex. Energies, Inc.*, 736 P.2d 888, 891 (Kan. 1987)).

that no disputed material fact exists" regarding untimely notice, and because Plaintiff has failed to show that a genuine dispute of material fact exists, Defendant is entitled to judgment as a matter of law on this issue.[89]

### D.    Notice-Prejudice Rule

Defendant next argues that although Plaintiff provided untimely notice, Defendant need not show that it was prejudiced by the late notice for this claims-made policy, a showing which is usually required when the insurer relies on a late-notice defense to deny coverage.  Plaintiff argues that the notice-prejudice rule still applies.

To decide this issue, the Court must ascertain Kansas law.  The Court must look to the rulings of the state's highest court, and where no controlling state decision exists, the Court must endeavor to predict how the state's highest court would rule.[90]  The Court should consider analogous decisions by the state supreme court, decisions of lower courts in the state, decisions of federal and other state courts, and the general weight and trend of authority.[91]  Ultimately, the Court's task is to predict what decision the Kansas Supreme Court would make if faced with the same facts and issue.[92]

The parties have offered no Kansas cases—from either the Kansas Supreme Court or the lower state courts—on this issue.  But the vast majority of courts do not apply the notice-prejudice rule to claims-made policies where the insured gives notice outside the policy period.[93]

---

[89] *Estrada v. Smart*, 107 F.4th 1254, 1261 (10th Cir. 2024).

[90] *Wade v. Emasco Ins. Co.*, 483 F.3d 657, 665 (10th Cir. 2007).

[91] *MidAmerica Constr. Mgmt., Inc. v. MasTec. N. Am., Inc.*, 463 F.3d 1257, 1262 (10th Cir. 2006).

[92] *Oliveros v. Mitchell*, 449 F.3d 1091, 1093 (10th Cir. 2006).

[93] *Craft v. Philadelphia Indem. Ins. Co.*, 560 F. App'x 710, 712 (10th Cir. 2014) ("Almost every court that has that has reached this question has declined to apply the notice-prejudice rule to claims-made policies.") (collecting cases).

Judge Teeter, for example, has recently concluded that under Kansas law, the notice-prejudice rule does not apply to claims-made policies.[94]  In those cases, the notice-prejudice rule did not apply when the insured gave notice outside the policy period; in other words, they did not comply with the policy-period provision.

But this case is different than those typical cases: the policy-period provision is not at issue; the prompt-notice provision is.  It is undisputed that Plaintiff complied with the policy-period provision by providing notice of the claim within the policy period.  Instead, Plaintiff's untimely notice contravened the prompt-notice provision, which required notice "as soon as practicable."  That distinction makes a world of difference for the propriety of applying the notice-prejudice rule.

A policy-period provision requires that "the claim be made during the policy period in order for the loss to be treated as falling within the period of time covered by the policy."[95]  The policy-period provision defines the scope of coverage.  So if an insured were permitted to give notice of the claim—that is, make the claim—outside of the policy period, it would "constitute[] an unbargained-for expansion of coverage"; that is why courts hesitate to apply the notice-prejudice rule to claims-made policies.[96]  But that concern wanes for a prompt-notice provision, which does not define the scope of coverage but rather ensures that the insurer has adequate time to respond to the claim.  The Tenth Circuit has acknowledged the difference that these two types of provisions play in a claims-made policy and the implications for whether the notice-prejudice

[94] *Phila. Indem.. Ins. Co. v. Great Plains Ann. Conf. of the United Methodist Church*, No. 21-1197, 2022 WL 522962, at *5 (D. Kan. Feb. 22, 2022) ("These arguments do not persuade the Court to break with the overwhelming majority of courts who have 'declined to apply the notice-prejudice rule to claims-made policies.'" (quoting *Craft*, 560 F. App'x at 712)).

[95] 13 Plitt et al., *supra* note 19, § 186:13.

[96] *Craft*, 560 F. App'x at 713.

rule should apply.[97]  And so have other courts, which still apply the notice-prejudice rule to a claims-made policy when notice was given within the policy period but not as soon as practicable (or whatever promptness standard the policy uses).[98]  Insurances treatises do, too.[99] Based on the general weight of authority and the notice-prejudice rule's weakened rationale in this context, the Court predicts that the Kansas Supreme Court would follow suit and apply the notice-prejudice rule where, as here, the insured gave notice within the policy period but not as soon as practicable.

Defendant does not offer persuasive counterarguments.  In fact, Defendant largely ignores the distinction drawn by Plaintiff and even concedes that Plaintiff gave notice "within the three-year policy period."[100]  Instead, Defendant obfuscates the issue by pointing to another prompt-notice requirement in the Multiple Year Endorsement, which requires that the insured "give the **Insurer** written notice, as soon as practicable, if [a triggering event] occur[s] during the **Policy Period**."[101]  But that is still not a policy-period provision that typically justifies discarding the notice-prejudice rule for claims-made policies.  It is akin to a prompt-notice provision because it calls on the insured to give timely notice but does not require—as a policy-

---

[97] *See Craft*, 560 F. App'x at 715

[98] *Child.'s Hosp. Colo. v. Lexington Ins. Co.*, No. 15-cv-01904, 2017 WL 135602, at *3 (D. Colo. Apr. 13, 2017) (applying notice-prejudice rule to claims-made policy where prompt-notice provision was at issue); *Providence Health & Servs. v. Certain Underwriters at Lloyd's London*, 358 F. Supp. 3d 1195, 1201 (D. Wash. 2019) (same); *PetroSantander (USA), Inc. v. HDI Global Ins. Co.*, 308 F. Supp. 3d 1207, 1215 (D. Kan. 2018) (same); *Prodigy Comm'ns Corp. v. Agric. Excess & Surplus Ins. Co.*, 288 S.W.3d 374, 382 (Tex. 2009) (same).  *But see Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 129 A.3d 1069, 1081 (N.J. 2016) (declining to apply notice-prejudice rule); *Centurion Med. Liab. Protective Risk Retention Grp. Inc. v. Gonzalez*, 296 F. Supp. 3d 1212, 1218 (C.D. Cal. 2017) (same).

[99] Restatement of the Law of Liability Insurance § 35 cmt. h (2019) ("Prejudice is required when notice is late but given before the end of the reporting period"); 13 Plitt et al., § 186:13 ("[T]he prompt notice of claim requirement and the 'claims made' within the policy period requirement serve such different purposes, and are of such different basic character, that the principles applied to one should have little or nothing to do with the principles applied to the other.").

[100] Doc. 53 at 7.

[101] Doc. 49-1 at 76.

period provision does—the notice itself to be given during the Policy Period.[102]  It just clarifies

that the *trigger event*, not *notice*, must occur during the Policy period.

Finally, Defendant raises one last argument—again, to no avail.  It points to the provision

that allows the insurer to modify the conditions and terms of the policy if the insured reports one

of the listed triggering events during the *Policy Year*.[103]  Whatever that provision entitles the

insurer to, it imposes no notice requirement on the insured; it does not include analogous claims-

made language that would justify treating it as a claims-made provision requiring notice to be

given during the Policy Period.  As Defendant notes, courts "hesitate to tinker" with the notice

provisions in a claims-made policy,[104] and the Court heeds that advice here by declining to read

one into this provision in the Multiple Year Policy Endorsement.

Following the general weight of authority, the Court therefore predicts that the Kansas

Supreme Court would apply the notice-prejudice rule to a claims-made policy when the insured

gave notice within the policy period but not as soon as practicable.

### E.    Prejudice

Because the Court concludes that the notice-prejudice rule applies, Defendant must show

that Plaintiff's late notice prejudiced it.  Defendant again bears the burden on this issue,[105] and

so—to make its summary judgment showing—it must come forward with evidence that, if

uncontroverted at trial, would entitle it to judgment as a matter of law.

The parties make extended argument about whether Defendant can show prejudice

through so-called "underwriting prejudice"—that is, the lost opportunity to alter the policy's

---

[102] *See Craft*, 760 F. App'x at 714–15.

[103] Doc. 49-1 at 77.

[104] Doc. 49 at 16.

[105] *See Geer v. Eby*, 432 P.3d 1001, 1011 (Kan. 2019) (placing burden on insurer to show prejudice).

retention or reserve amounts. They also dispute whether Defendant can rely on prejudice from the Multiple Year Policy Endorsement's notice provision when it did not identify that provision in its preliminary analysis denying coverage. But even assuming that Defendant can show prejudice through the Multiple Year Policy Endorsement's notice provision and its lost opportunity to modify the Policy's terms, a genuine dispute of material fact still remains about whether Defendant's opportunity to diminish its underwriting risk was substantially prejudiced. On that ground alone, Defendant is not entitled to summary judgment.

To show underwriting prejudice, Defendant marshals several facts. Defendant submits evidence that the purpose of the notice provision in the Multiple Year Policy Endorsement was to give Defendant the opportunity to "review and address, through re-underwriting at each Policy Year anniversary, changes in the risk to Defendant posed by the Policy with its three-year policy period."[106] Defendant's right to do so is triggered if it makes a loss, claim, or damage payment in excess of $25,000,[107] and if Plaintiff had provided notice, Defendant would have incurred defense coverage at least. And, according to Defendant, Defendant's underwriters characterize the MRI claim as a systemic risk because it considers a third-party claim against the insured to be a systemic risk.[108] Designating the claim as a systemic risk would have caused Defendant to take action on that provision.[109] So if Defendant had received notice of the MRI claim, it would have "increased the retention" on that "particular coverage line at play."[110] The lost opportunity to increase the policy's retention was, according to Defendant, substantial prejudice.

---

[106] Doc. 49-11 ¶ 5.

[107] Steiner Dep., Doc. 49-7 at 107:1–3.

[108] Micciche Dep., Doc. 49-8 at 61:17–22; id. at 58:16–20.

[109] Id. at 61:17–22.

[110] Id. at 76:10–77:4.

But Plaintiff shows that a genuine dispute of material fact exists on the prejudice issue. Plaintiff first disputes that Defendant would have characterized the MRI claim as a systemic risk. As support for that assertion, Plaintiff points out that Defendant generally characterizes Plaintiff as a "good account" because it is in "good financial condition" and is privately held and so (in Defendant's view) faces fewer risks.[111] In Lisa Micciche (Defendant's corporate representative for underwriting)'s testimony, Micciche explained that she was not aware of anyone at Defendant who considered the MRI claim a systemic risk. Further, Plaintiff points to Micciche's testimony that many factors play a role in determining systemic risk (for example, the existence of mitigating circumstances) that Defendant did not evaluate for the MRI claim and that, if considered, would have counseled against designating the MRI claim as a systematic risk. Moreover, Plaintiff disputes that Defendant would have actually taken action to increase the policy's retention. In particular, Plaintiff points to Micciche's testimony that she remembered no instance of a claim triggering Defendant to take action when the reserves for the claim were set below $200,000 (as here). These facts create a factual dispute over whether Defendant, if it had received timely notice, would have taken the opportunity to modify the Policy's terms. So drawing reasonable inferences in favor of Plaintiff as the nonmovant, the Court concludes that a genuine dispute of material fact remains on whether Defendant was prejudiced by Plaintiff's late notice. Because Defendant has failed to show that genuine dispute of material fact does not exist, it is not entitled to summary judgment on the prejudice issue.

**F.    Bad-Faith Denial of Coverage**

Under K.S.A. § 40-256, an insured is entitled to attorney's fees if the insurer denied coverage "without just cause or excuse." Plaintiff bears the burden to show denial without just

---

[111] *Id.*, Doc. 50-2 at 33:22–34:3.

cause.[112]  An insurer denies coverage without just cause if it denies arbitrarily, capriciously, or in

bad faith.[113]  Thus, where the insurer's denial is a "frivolous and unfounded denial of liability

that is patently without any reasonable foundation, it is without just cause or excuse."[114]  But an

insurer denies with just cause—and thus fees must be denied to the insured—where (1) a "good

faith legal controversy" exists regarding the denial of coverage, particularly when it depends on

an issue of first impression, or (2) "there is a bona fide and reasonable factual ground" for

denial.[115]

Both of those just causes are present here.  The parties here have litigated a good faith

legal controversy; that is, whether the notice-prejudice rule applies to claims-made policies.

Though the Court agrees with Plaintiff that the rule applies in this case, Kansas law was silent on

the issue, and it was therefore an issue of first impression under state law.  Further, Defendant

pointed to at least one state supreme court that declined to apply the rule in an analogous

scenario.[116] And the Tenth Circuit has even certified this very question,[117] which Plaintiff

hyperbolically calls an "exploratory 'test balloon.'"[118]

Defendant also had a reasonable factual ground to deny coverage.  The undisputed facts

here show that Nigro originally considered that coverage would be denied under the D&O

---

[112] *See Hofer v. Unum Life Ins. Co. of Am.*, 338 F. Supp. 2d 1252, 1254 (D. Kan. 2004) (requiring plaintiff to show entitlement to attorney's fees).

[113] *Kan. Heart Hosp., LLC v. Exec. Risk Indem., Inc.*, No. 06-1345, 2008 WL 11443101, at *22 (D. Kan. July 7, 2008).

[114] *Id.* (citing *Pac. Emps. Ins. v. P.B. Hoidale Co.*, 804 F. Supp. 137, 144 (D. Kan. 1992)).

[115] *Glickman, Inc. v. Home Ins. Co.*, 887 F. Supp. 259, 261 (D. Kan. 1995) (citing *Farm Bureau Mut. Ins. Co. v. Carr*, 528 P.2d 134 (1974)).

[116] *Templo Fuente De Vida Corp. v. Nat. Union Fire Ins. Co.*, 129 A.3d 1069 (2016).

[117] *Craft v. Phila. Indem. Ins. Co.*, 560 F. App'x 710, 715 (10th Cir. 2014) ("Thus, we look . . . for guidance on whether, if the notice-prejudice rule applies to claims-made policies, it applies to both notice provisions in those policies.").

[118] Doc. 50 at 38.

policy's Contract Exclusion, but later—after speaking with Eilrich and learning about Plaintiff's pre-suit mediation—she determined that denial was appropriate because notice was not timely.[119] So in the denial letter, Nigro explained that coverage would be denied because Plaintiff did not give notice "as soon as practicable" as required by Section X of the Policy (as amended by the Vista Endorsement).[120] For the reasons explained above in the Court's finding that Plaintiff did not give notice as soon as practicable, Nigro's denial based on untimely notice had a reasonable factual ground. But to reiterate here, learning that the insured entered mediation nine months before giving notice of the claim is not an unreasonable factual ground to deny coverage. Plaintiff distracts from that point by contending that Nigro testified that she determined notice was late under the Multiple Year Policy Endorsement "based on the policy year that we were in and the time that the claim arose,"[121] but—and this is apparently what supports an inference of bad faith—she did not cite the Endorsement in the denial letter; instead, she cited the "as soon as practicable" language in the Policy. The Court fails to see how that fact is relevant (and thus material) to whether Defendant had a reasonable factual basis, after learning of the mediation many months earlier, to deny coverage because notice was not given as soon as practicable, which Plaintiff concedes Defendant relied on in the letter. [122] Because Defendant's denial of coverage was based on a good-faith legal controversy and had a reasonable factual basis based

---

[119] Plaintiff does not controvert this fact; it disputes the inference that Defendant attempts to draw from it in the brief's argument section.

[120] Doc. 50-17.

[121] Nigro Dep., Doc. 50-19 at 86:12–16.

[122] Doc. 50 at 39 ("Nigro issued a denial letter premised on the only policy language she could find that might justify her newfound basis: the 'as soon as practicable' language.").

on the months-long delay between mediation and notice, it was not a denial "frivolous or patently without reasonable foundation"[123] and therefore was made with just cause.

Because Defendant's denial of coverage was based on a good-faith legal controversy and reasonable factual foundation—both just excuses for denial under the statute—Plaintiff has failed to show the existence of genuine dispute of material fact on its bad-faith denial claim. Defendant is therefore entitled to summary judgment on it.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion for Summary Judgment (Doc. 48) is **granted in part** and **denied in part**.  The motion is granted to the extent that Plaintiff's claims seek relief beyond payment of defense costs; the motion is granted on Plaintiff's claim for pre-tender defense costs; the motion is granted on Plaintiff's claims for attorney's fees under K.S.A. § 40-256; and the motion is granted on the issue of untimely notice.  The motion is otherwise denied.

**IT IS SO ORDERED.**

Dated: January 30, 2025

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[123] *Fid. & Deposit Co. of Md. v. Hartford Cas. Ins. Co.*, 215 F. Supp. 2d 1171, 1192 (D. Kan. 2002).